UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CAMILLE POUX and RALPH POUX,

                   Plaintiffs,

        - against-

THE COUNTY OF SUFFOLK, THOMAS J.
SPOTA, individually and as District Attorney
of the County of Suffolk, LINDA A. RUGGIERI,
individually and as Assistant District Attorney
of the County of Suffolk, GRAZIA DIVINCENZO,
individually and as Assistant District Attorney
of the County of Suffolk, THE COUNTY OF
NASSAU, DET. RONALD SCHEPIS, Shield
No. 883, KATHLEEN RICE, individually and
as District Attorney of the County of Nassau,
MINDY PLOTKIN, individually and as
Assistant District Attorney of the County of
Nassau, MELISSA MORRONE, individually
and as Assistant District Attorney of the County
of Nassau, CITIBANK, N.A., CITIGROUP
INVESTIGATIVE SERVICES, DARREN V.
FINN, CITIGROUP, INC., DET. INV. JOHN
WHITE, Shield No. 265 and MALLORY O.
SULLIVAN, individually and as Assistant
District Attorney of the County of Suffolk,

                   Defendants.
--------------------------------------------------------X
FEUERSTEIN, J.

**OPINION AND ORDER
09 CV 3081 (SJF)(WDW)**

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   MAR 2 3 2012   ★

**LONG ISLAND OFFICE**

      On July 17, 2009, plaintiffs Camille Poux ("Poux") and Ralph Poux ("Ralph")

(collectively, "plaintiffs") filed this action against: (1) the County of Suffolk ("Suffolk County"),

Thomas J. Spota ("Spota"), individually and as District Attorney of the County of Suffolk,

Grazia Divincenzo ("DiVincenzo"), individually and as Assistant District Attorney of the County

of Suffolk, Detective Investigator John White ("White"), Shield No. 265, Linda A. Ruggieri

1

("Ruggieri"), individually and as Assistant District Attorney of the County of Suffolk, and

Mallory O. Sullivan ("Sullivan"), individually and as Assistant District Attorney of the County of

Suffolk, (collectively, "the Suffolk County defendants"); (2) the County of Nassau ("Nassau

County"), Detective Ronald Schepis ("Schepis"), Shield No. 883, Kathleen Rice ("Rice"),

individually and as District Attorney of the County of Nassau, Mindy Plotkin ("Plotkin"),

individually and as Assistant District Attorney of the County of Nassau, and Melissa Morrone

("Morrone"), individually and as Assistant District Attorney of the County of Nassau,

(collectively, "the Nassau County defendants"); and (3) Citibank, N.A. ("Citibank"), Citigroup

Investigative Services ("CIS"), Darren V. Finn ("Finn") and Citigroup, Inc. ("Citigroup")

(collectively, "the Citibank defendants"), pursuant to, *inter alia*, 42 U.S.C. §§ 1981, 1983, 1985,

1986 and 1988, alleging violations of Poux's constitutional rights, and asserting pendent state

law claims for false arrest and imprisonment; malicious prosecution; assault and battery;

negligent supervision, hiring and retention; negligence; intentional and negligent infliction of

emotional distress; and loss of consortium.

By order dated May 4, 2010, the motions of the Nassau County defendants and Suffolk

County defendants seeking dismissal of plaintiffs' complaint were granted to the extent that: (1)

plaintiffs' Section 1983 and state law claims for false arrest, false imprisonment, assault and

battery (plaintiffs' first through fourth causes of action in the original complaint) were dismissed

in their entirety with prejudice; (2) plaintiffs' Section 1983 and state law malicious prosecution

claims (plaintiffs' third, fourth, fourteenth and fifteenth causes of action in the original

complaint) were dismissed with prejudice as against the D.A. defendants, Nassau County and

Suffolk County; (3) plaintiffs' conspiracy claims (plaintiffs' seventh, tenth, twelfth and thirteenth

causes of action in the original complaint) were dismissed in their entirety without prejudice and with leave to amend within thirty (30) days from the date of that Order; (4) plaintiffs' Section 1986 claim (eleventh cause of action in the original complaint) was dismissed in its entirety with prejudice; (5) plaintiffs' failure to intercede and Section 1981 claims (eighth and ninth causes of action in the original complaint) were dismissed with prejudice to the extent they are based upon acts or omissions occurring prior to July 17, 2006; (6) plaintiffs' state law negligence and intentional and negligent infliction of emotional harm claims (plaintiffs' seventeenth, nineteenth and twentieth causes of action in the original complaint) were dismissed with prejudice as against the Nassau County defendants; and (7) Ralph's loss of consortium claim (twenty-third cause of action in the original complaint) was dismissed with prejudice as against the Nassau County defendants, and the motions were otherwise denied.

Upon plaintiffs' filing of a third amended complaint, the following claims remain in this action: (1) plaintiffs' malicious prosecution claims against Schepis pursuant to Section 1983 (second cause of action in third amended complaint), against White pursuant to Section 1983 (first cause of action in third amended complaint) and state law (ninth cause of action in third amended complaint) and against the County of Suffolk pursuant to state law (ninth cause of action in third amended complaint); (2) plaintiffs' failure to intercede and Section 1981 claims against the Suffolk County and Nassau County defendants (seventh and eighth causes of action in third amended complaint), to the extent those claims are based on conduct occurring on or after July 17, 2006; (3) plaintiffs' state law negligence and intentional and negligent infliction of emotional distress claims against the Suffolk County defendants (tenth, eleventh and twelfth causes of action in third amended complaint); (4) plaintiffs' Section 1983 <u>Monell</u> claims against

3

Suffolk County and Nassau County (thirteenth and fourteenth causes of action in third amended complaint, respectively), except to the extent those claims are based upon the D.A. defendants' alleged malicious prosecution of Poux; (5) Ralph's state law loss of consortium claim against the Suffolk County defendants (fifteenth cause of action in third amended complaint); (6) plaintiffs' Section 1983 and 1985 conspiracy claims (third, fifth, sixth and fourth causes of action in third amended complaint); and (7) plaintiffs' Section 1988 claims for attorneys' fees against the Suffolk County and Nassau County defendants (sixteenth and seventeenth causes of action in third amended complaint, respectively).

Pending before the Court are defendants' respective motions for summary judgment dismissing the third amended complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure, and plaintiffs' motion for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motions are granted and plaintiffs' motion is denied.


I.      Background

        A.      Factual Background

                1.      The Parties

Poux is a thirty-four (34) year old African-American woman and Ralph is her husband. (Nassau 56.1 Stat., ¶ 2; Plf. Response to Nassau 56.1 Stat., ¶ 2). Between December 2004 and January 2005, Poux used the name "Camille Murray." (Nassau 56.1 Stat., ¶ 4; Plf. Response to Nassau 56.1 Stat., ¶ 4; Declaration of Richard Gross in Opposition to Defendants' Motion for Summary Judgment [Gross Decl.], Ex. A at 220). Poux has had a New York State driver's

license bearing license number 796 638 294 since she was eighteen (18) years old. (Id. at ¶¶ 6). In 2004, Poux had a Discover credit card in the name "Camille Murray" bearing account number ending in -2896, which was deactivated on December 3, 2004. (Id. at 7).

At all relevant times, Schepis was a detective in the Nassau County Police Department ("NCPD") assigned to the fraud and forgery unit of the Crimes Against Property ("CAP") Squad. (Petillo Decl., Ex. N, at 17, 39-40).

It is undisputed that at all relevant times, Rice was the District Attorney ("D.A.") for Nassau County; Plotkin and Morrone were assistant district attorneys ("ADAs") for Nassau County; White was an investigator with the Suffolk County D.A's Office; Spota was the D.A. for Suffolk County; and Ruggieri, Sullivan and DiVincenzo were ADAs for Suffolk County.

At all relevant times, Finn was employed by Citigroup as vice-president senior investigator in its Citigroup Investigative Services ("CIS") department. (Gross Decl., Ex. O at 4; Declaration of Frances Norek Hatch in Support of Motion for Summary Judgment ["Hatch Decl."], Ex. NN at 37-9). According to Finn, Citigroup is the parent company of Citibank. (Hatch Decl., Ex. NN at 38).

2.    The Citibank Defendants' Investigation of Counterfeit Check Transactions

Between December 8, 2004 and January 21, 2005, a series of fraudulent payroll checks were cashed by at least five (5) individual(s) at various Nassau County and Suffolk County bank branches owned, operated and controlled by Citibank. (See, Declaration of Diane C. Petillo in Support of the Nassau County Defendants' Motion for Summary Judgment [Petillo Decl.], Ex. F; Gross Decl., Ex. O at 5-6; Hatch Decl., Ex. W). It is undisputed: (a) that eight (8) checks drawn

on the account of Wilens & Baker PC and five (5) checks drawn on the account of Suffolk

Transportation Services Inc. ("STS"), each in the amount of nine hundred seventy-five dollars

and fifty cents ($975.50) and made payable to "Camille Murray," were negotiated at various

Citibank branches in Nassau and Suffolk Counties; (b) that a New York State driver's license

bearing identification number 796 638 294 and a Discover credit card for account number ending

in -2896, each in the name of "Camille Murrary," were used as identification during each of the

transactions; and (c) that the backs of all of those checks were signed in the name "Camille

Murray." (Nassau Def. 56.1 Stat. ¶¶ 20-25; Plf. Response to Nassau 56.1 Stat., ¶¶ 20-25; Gross

Decl., Ex. A at 198, 217, 219; Hatch Decl., Ex. NN at 191). Poux testified during her deposition

that the signatures on the back of those checks were not hers and that she had not presented those

checks at the various Citibank branches. (Gross Decl., Ex. A at 196, 198, 202, 215, 218, 220-21,

234-35). According to Poux, her purse, with her driver's license and Discover credit card in it,

had been stolen at some time in December 2004, although she could not recall the exact date,

(Petillo Decl., Ex. M at 204, 248; Gross Decl., Ex. A at 133, 140); and she had reported the theft

to the 70th Precinct in Brooklyn, (Id. at 247-48), but was never able to get a copy of the police

report because an unidentified officer(s) told her that they could not find it, (Id., at 254-55).

According to Poux, she had only requested the police report verbally and had never made a

written request for it or received a written response to her verbal request(s) for it. (Id. at 353). In

addition, Poux testified that she had immediately reported her Discover credit card stolen, but did

not seek to have her driver's license reissued until February 8, 2005. (Petillo Decl., Ex. M at

207-08; Gross Decl., Ex. A at 142).

On or about December 22, 2004, STS completed two (2) "Affidavit[s] of Forgery,

6

Alteration or Unauthorized Online Wire Transfers" ("Affidavit of Forgery") at Citibank's Bay

Shore branch indicating, *inter alia*, that approximately fifty-four (54) counterfeit checks, totaling

fifty-nine thousand seven hundred fifty-six dollars and thirty-four cents ($59,756.34), had been

cashed against its account at Citibank.[1] (Petillo Decl., Exs. F and O at 96; Affirmation of Arlene

S. Zwilling in Support of Suffolk County Defendants' Motion Pursuant to Rule 56 ["Zwilling

Aff."], Ex. D). In December 2004, Citibank assigned Finn to investigate the counterfeit check

transactions. (Citibank Aff., Ex. A; Hatch Decl., Ex. NN at 61).

Finn testified during his deposition that the first thing he did after being assigned the case

was to attempt to obtain copies of the counterfeit checks and the Affidavit(s) of Forgery from the

respective Citibank branches involved. (Hatch Decl., Ex. NN at 64-65, 67, 660). Finn then

created a spreadsheet in an attempt to correspond the information, i.e., to determine who was

passing the forged checks on the specific dates and times. (Id. at 201). According to Finn, he did

not assist with the prosecution of the cases, but only completed sworn depositions to the

detectives assigned and provided them with the documents and videotapes he had collected from

the Citibank branches involved. (Id. at 294-98). Finn testified that neither Schepis nor White

ever interjected themselves into his internal investigation; told him how he should handle the

evidence; demanded or requested that he prepare, or have prepared, Affidavits of Forgery; or

demanded or insisted that he gather certain evidence. (Id. at 660-62).

During his deposition, Finn testified that all of the Citibank branches involved were

equipped with video surveillance equipment. (Hatch Decl., Ex. NN at 183). On or about January

---

[1] According to Finn, in order to be reimbursed for the funds drawn from its account, STS had to contact its "financial center of domicile," prepare an Affidavit of Forgery and forward it to Citibank for reimbursement. (Petillo Decl., Ex. O at 96; Citibank Ex. NN at 62, 65-66, 661-62).

6, 2005, Finn requested that the Citibank branches in which the counterfeit check transactions occurred retain all surveillance tapes and copy DVDs for the specific dates and times during which those transactions occurred and provide them to Citibank's Crisis Management unit for review. (Plf. Ex. T; Ex. F at 211; Hatch Decl., Ex. NN at 201, 209-12, 221). According to Finn, if Crisis Management got a "hit," i.e., found someone at the specific time during the transaction at issue, he would be notified, (Hatch Decl., Ex. NN at 222, 317-19, 327), and the tape would then be forwarded to the prosecutor or law enforcement officer handling the matter, (Id. at 224). Finn further testified that he received some of the tapes and DVDs he had requested, with photographs attached, from the Crisis Management unit; that four (4) of the tapes he received "contained Camille Murray: one in Franklin Square, one in Melville, one in Huntington, and one in Central Islip;" and that tapes and discs which did not have a "hit," i.e., depict a transaction occurring at the time and date alleged, were recycled back to the financial center by the Crisis Management unit. (Gross Decl., Ex. F at 315-16, 333-34, 338-39; Ex. F at 28; Hatch Decl., Ex. NN at 174-76).

On or about January 19, 2005, STS completed another Affidavit of Forgery at Citibank's Bay Shore branch indicating that on that same date, additional counterfeit checks were cashed against its account. (Petillo Decl., Ex. F; Zwilling Aff., Ex. D).

On April 20, 2005, Finn recommended that Citibank close its case against Poux, among others, "pending further developments by law enforcement." (Hatch Decl., Ex. V). On July 6, 2005, Finn reported internally that the case was still being investigated by law enforcement officials and that he would continue to monitor it. (Hatch Decl., Ex. W).

8

3.    The Suffolk County Proceedings

a.    The Investigation

On or about January 4, 2005, Ann Marie Amadeo ("Amadeo"), comptroller for STS, provided a sworn deposition to White indicating, *inter alia*: (1) that between December 9 and December 20, 2004, fifty-four (54) counterfeit payroll checks drawn on STS's account at Citibank had been "presented at various Citibank branches for cashing;" (2) that STS had not issued those checks and had not authorized any other party to issue checks from that payroll account; and (3) that none of the names displayed on the fraudulent checks were listed in the company's records as having previously worked for STS. (Zwilling Aff., Ex. D).

On January 21, 2005, at approximately 1:00 p.m., the SCPD responded to a call from the Citibank branch located at 6105 Jericho Turnpike, Commack, New York, reporting that a black male and black female had attempted to cash a counterfeit check; that they had fled in a white pearl Cadillac Escalade; and that Lynn Racioppo ("Racioppo"), the assistant manager at the branch, had the counterfeit check and identification presented by those individuals during the transaction. (Zwilling Aff., Ex. A; Hatch Decl., Ex. M and Ex. NN at 568, 615). Finn recovered the counterfeit check, driver's license and Discover credit card presented as identification during the transaction from Racioppo, then provided those materials to White. (Citibank Ex. NN at 144, 192-93, 216-17, 555).

On or about January 24 or 25, 2005, White secured eleven (11) counterfeit checks that had been cashed and one (1) that had not been cashed, each bearing a signature or endorsement in the name of "Camille Murray;" Poux's driver's licence; and Poux's Discover credit card as evidence and deposited them with the SCPD Property Section. (Zwilling Aff., Ex. C; Hatch

9

Decl., Ex. JJ at 237). According to White, he compared the signatures on the Discover credit card, driver's license and checks and determined that they matched. (Hatch Decl., Ex. JJ at 239).

In a sworn statement to White dated February 22, 2005, Finn indicated, *inter alia*: (1) that between December 9, 2004 and December 21, 2004, fifty-four (54) counterfeit payroll checks, totaling fifty-nine thousand seven hundred fifty-six dollars and thirty-four cents ($59,756.34) and drawn on the account of STS, had been cashed by five (5) individuals at various Citibank branches in Suffolk and Nassau Counties; (2) that STS had not issued or authorized the issuance of those checks and had supplied Citibank with an Affidavit of Forgery for all of the counterfeit checks; (3) that the paper stock used to print the counterfeit checks was not of the same stock typically used by STS for its payroll checks; (4) that the check numbers of the counterfeit checks were not the same sequence as those issued by STS; and (5) that six (6) of the checks, totaling five thousand eight hundred fifty-three dollars ($5,853.00), were payable to "Camille Murray." (Plf. Ex. R).

On or about March 28, 2005, Finn provided a sworn deposition to White indicating, *inter alia*, that based upon his examination of video surveillance cameras in Citibank's Melville branch and the identification information recorded on the back of a counterfeit check, he determined that on December 20, 2004, at approximately 3:14 p.m.: (1) a female presented to a teller at that Citibank branch (a) a counterfeit check drawn on STS and payable to "Camille Murray" in the amount of nine hundred seventy-five dollars and fifty cents ($975.50), (b) a New York State driver's license in the name of "Camille Murray," bearing identification number 796 638 294 and (c) a Discover credit card ending in number -2896 in the name of "Camille Murray;" (2) the teller had cashed the counterfeit check and gave that individual cash in the check amount;

and (3) the counterfeit check transaction had been recorded on surveillance cameras and the images had been downloaded therefrom. (Plf. Ex. L; Zwilling Aff., Ex. D). Finn further averred that "[b]ased upon [his] experience in the viewing of th[o]se images, [he] ha[d] determined that the individual in the photo is the individual *who presented herself to the teller as Camille Murray*" (emphasis added) and that those images had been supplied to the Suffolk County D.A.'s Office. (Id.)

Based upon the sworn depositions of Finn and Amadeo and the Affidavit of Forgery dated December 22, 2004, White signed a felony complaint against Poux charging her with criminal possession of a forged instrument in the second degree in violation of New York Penal Law Section 170.25 and petit larceny in violation of New York Penal Law Section 155.25. (Zwilling Aff., Exs. D and E; Plf. Ex. B; Petillo Decl., Ex. Q at 10; Zwilling Aff., Ex. E). According to Finn, he did not know what charges were brought against Poux, (Hatch Decl., Ex. NN, at 183), and did not have any input into what those charges were. (Id. at 577).

Prior to his involvement in this case, White had never had any contact with Finn, whom he considered to be a witness in the case. (Hatch Decl., Ex. JJ at 64, 150). White testified that he never did anything during his investigation of Poux at the insistence of Finn and that Finn never interjected himself into, interfered with or attempted to control or influence White's investigation or the prosecution of Poux in Suffolk County. (Hatch Decl., Ex. JJ at 239-41).

b. Poux's Arrest

On or about June 1, 2005, at approximately 9:45 a.m., White arrested Poux near 531 East 22nd Street in the County of Kings, New York. (Plf. Ex. B; Petillo Decl., Ex. Q at 10; Zwilling

Aff., Ex. E) According to White, he had identified Poux through her driver's license and from his surveillance on her house, which confirmed that she lived at the address on the driver's license that had been confiscated at Citibank's Commack branch. (Ex. E at 145). In addition, White testified that he compared the photographs and videotapes he received from Citibank with Poux and determined that Poux and the person depicted thereon were the same person. (Hatch Decl., Ex. JJ at 215-16).

c.    The Prosecution

Ruggieri testified that after discussing the case with her supervisors and Poux's defense counsel, who made it clear that he would not accept a plea or other disposition of the case, she, together with her supervisors in the Suffolk County D.A.'s Office, collectively "decided to indict the case." (Hatch Decl., Ex. KK at 33, 147-48). Ruggieri testified that she had no prior dealings with Finn; that Finn never demanded that she prosecute Poux or insist that she continue with the prosecution of Poux; that Finn did not determine who she would present to the grand jury as witnesses; and that she never asked Finn to prosecute the case for her. (Id. at 33, 147-50).

Zahra Zahedi ("Zahedi") testified before the Suffolk County grand jury, and during the Nassau County criminal trial, that on January 21, 2005, while she was working as a teller at the Citibank branch located at 6105 Jericho Turnpike, Commack, New York, a woman presented her with a check payable in the amount of nine hundred eighty-five dollars and seventy-five cents ($985.75) which she did not cash because approximately ten (10) days earlier she had been provided with a list of five (5) people who were suspected of presenting counterfeit checks. (Gross Decl., Ex. I at 31, 33; Zahedi TT. 256-62, 265-66). Zahedi testified that when she saw

that the name on the check matched one of the names on the list of suspects, she brought the checks and two (2) forms of identification to the operations manager. (Zahedi TT, 262). When she returned to the window, the woman who had presented the check and identification ran away, leaving the check and identification behind. (Id. at 263). According to Zahedi, the woman matched the picture on the driver's license presented to her. (Id. at 264).[2]

During his testimony before the Suffolk County grand jury, Finn testified that at all relevant times, he was an investigator employed by CIS and that he knew Poux as "an individual who had been cashing fraudulent checks," drawn on the accounts of STS, Wilens and Baker P.C. and St. Christopher Ottilie SCO Family Services, in various branches of Citibank throughout Suffolk County between December 9, 2004 and January 21, 2005. (Plf. Ex. K at 4-6, 17-22; Gross Decl., Ex. O at 5). Finn testified that on December 20, 2004, Poux cashed one of the checks, drawn on the account of STS and payable to "Camille Murray" in the amount of nine hundred seventy-five dollars and fifty cents ($975.50), at the Citibank branch located at 425 Broad Hollow Road, Melville, New York, and received the proceeds of that check in cash. (Plf. Ex. K at 6-7, 9; Gross Decl., Ex. O at 6-7). According to Finn, he determined that Poux had cashed the check "off of the surveillance tapes that were done" and from the driver's license and charge card presented as identification and recorded on the back of the check when the check had been cashed. (Plf. Ex. K at 7-10, 22; Gross Decl., Ex. O at 7-9; Finn Dep., at 7-8). Finn further testified that Poux had cashed ten (10) other counterfeit checks at Citibank branches in Suffolk

---

[2] The Nassau County Court instructed the jury that Zahedi's testimony concerning a crime committed outside of Nassau County could not be considered to establish Poux's guilt or innocence of the crimes for which she was charged in Nassau County, but was being offered solely for the purpose of identification. (Zahedi TT. at 265).

County, receiving a total amount of ten thousand seven hundred fifty-one dollars ($10,751.00), but she had not been successful in cashing a twelfth check drawn from the account of St. Christopher-Ottilie and payable to her in the amount of nine hundred eighty-five dollars and seventy-five cents ($985.75) because the teller, Zahedi, had recognized her name from a list Finn had prepared of individuals wanted in connection with cashing fraudulent checks. (Plf. Ex. K at 10-11, 17, 19-22; Gross Decl., Ex. O at 8, 10, 18-22; see also Petillo Decl., Exs. F and H). According to Finn, when Zahedi left her teller's window to confer with the operations manager, Poux left the bank, leaving behind her driver's license, her Discover credit card and the counterfeit check, which were then confiscated by Citibank. (Plf. Ex. K at 11-15; Gross Decl., Ex. O at 12-17). During her deposition, Poux denied ever going to the Commack branch of Citibank, where those items had been confiscated, or leaving her identification there on January 21, 2005. (Gross Decl., Ex. A at 202-03).

No later than June 16, 2006, a grand jury in Suffolk County indicted Poux with twelve (12) counts of criminal possession of a forged instrument in the second degree in violation of New York Penal Law Section 170.25 and one (1) count of grand larceny in the third degree in violation of New York Penal Law Section 155.35. (Petillo Decl., Ex. Q at 10; Zwilling Aff., Ex. G).

On or about July 5, 2006, defense counsel for Poux served the Suffolk County D.A.'s Office with a Notice of Alibi pursuant to New York Criminal Procedure Law Section 250.20(1) which: (1) indicated that at the time of the commission of the Suffolk County crimes for which she was charged, Poux had been at work, located at 2116 Cortelyou Road, Brooklyn, New York, and (2) identified nine (9) witnesses Poux intended to call at trial in support of her alibi defense.

14

(Zwilling Aff., Ex. H; see also Ex. A at 44, 53).

By order dated November 15, 2007, the County Court of the State of New York, County of Suffolk (Hudson, J.), *inter alia*, denied the branches of Poux's application seeking dismissal of the indictment pursuant to New York Criminal Procedure Law Section 210.20(1)(b) due "to the sufficiency of the Grand Jury presentation" and as a result of "alleged Brady violations." (Zwilling Aff., Ex. I). The County Court found, *inter alia*, based upon an *in camera* inspection of the grand jury minutes, that "the evidence presented to the Grand Jury was legally sufficient to sustain the indictment * * *." (Id. at 2). In addition, the County Court held, *inter alia*:

> "The People are not legally responsible for the production of video material not in their possession * * * there is no indication that the People were ever in possession of the missing video. The People fulfilled their legal responsibility by providing the video in their possession ([N.Y.] CPL 240.20).
>
> Lost or destroyed surveillance videos and photographs does not constitute a Brady violation unless there is a showing that they were exculpatory or that they were in possession of the prosecution or police * * *. The Court does not agree with [Poux] that the missing videos/pictures is Brady material. The resemblance or lack of resemblance of [Poux] to a photo or video is an issue of fact for a jury to decide. The Court also does not agree with [Poux] that a Citibank investigator is an agent of the District Attorney's office. * * * A bank investigator is an employee of the bank. There has been no showing that the investigator was acting on the direction of the prosecutor or police."

(Id. at 9-10).

By order dated April 7, 2008, the County Court, *inter alia*, upon reargument, again denied Poux's application to dismiss the indictment due to the sufficiency of the Grand Jury presentation and alleged Brady violations. (Zwilling Aff., Ex. J).

On July 14, 2008, the Suffolk County D.A.'s Office moved to dismiss the Suffolk County charges against Poux pursuant to New York Criminal Procedure Law Section 160.50, (Plf. Ex. E;

Petillo Decl., Ex. Q at 10; Zwilling Aff., Ex. K), on the basis that "[al]though [the prosecution] believe[d] at the time of [Poux's] arrest [that] there was probable cause * * * during the extensive investigation that the [prosecution] ha[d] done and during * * * preparation for trial * * *, in [its] dealings with Citibank, * * * [it] would not be able to prove [its] case beyond a reasonable doubt * * *." (Zwilling Aff., Ex. K at 2). The County Court granted the motion to dismiss on consent. (Id. at 3).

By Sealing Order dated July 16, 2008, the County Court ordered, *inter alia*, that Poux's June 1, 2005 arrest and subsequent prosecution thereon "shall be deemed a nullity." (Id.)

### 4. The Nassau County Proceeding

#### a. The Investigation

On or about February 9, 2005, Finn provided Schepis with: (1) a signed deposition; (2) sixteen (16) counterfeit Citibank checks[3] that had been (a) drawn on the account of Wilens and Baker P.C. in the total amount of seventeen thousand two hundred twenty-five dollars and seventy cents ($17,225.70), (b) made payable to "Camille Murray" and two (2) other individuals and (c) negotiated at Citibank branches throughout Nassau County between December 7, 2004 and December 13, 2004, and that contained Poux's driver's license and Discover credit card numbers and her name recorded on the back; and (3) Affidavits of Forgery. (Plf. Ex. G; Petillo Decl., Ex. I; See, Petillo Decl., Exs. F-J, and N at 108, 110-12, 157, 252, 296, 308; Gross Decl., Ex. G at 160-61, 212, 216-18, 231, 248-49, 300-01). In another sworn deposition to Schepis,

---

[3] In his sworn deposition to Schepis, Finn indicated, *inter alia*, that Wilens and Baker had signed Affidavits of Forgery for all sixteen (16) checks. (Plf. Ex. H).

dated March 22, 2005, Finn indicated, *inter alia*: (1) that between December 9, 2004 and December 20, 2004, "dozens of counterfeit checks were negotiated in Nassau County with losses of approximately $20,000;" (2) that the checks were made payable to "Camille Murray" and four (4) others, all of whom used photo identification to negotiate the checks; and (3) that one of the victims was STS, which had been reimbursed by Citigroup. (Plf. Ex. I; Petillo Decl., Exs. I and N at 157). At some point in the investigation, Finn also provided Schepis with a photograph that he said depicted a person who had presented a counterfeit check in a Citibank branch in Suffolk County and identified herself with a New York State driver's license and a Discover credit card. (Gross Decl., Ex. G at 169-71, 210-11).

During his investigation, Schepis ascertained that Poux did, in fact, reside at the address recorded on the back of the counterfeit checks and had learned from one of her neighbors where she worked. (Petillo Decl., Ex. N at 314).

During his deposition, Schepis testified that he knew Finn since 2002 in connection with other investigations involving Citibank, (Petillo Decl., Ex. N, at 59-63); that neither Finn nor anyone else at Citibank ever directed or insisted that he conduct an investigation of, or arrest, Poux, (Id. at 314-15, 318); and that he never conspired with either Finn or White with respect to the investigation, arrest and prosecution of Poux, (Id. at 315, 346, 374; Hatch Decl., Ex. LL at 322-25, 374). According to Schepis, once he received the information from Finn, it was his own decision to proceed with the investigation and to arrest Poux and charge her with the specific crimes; Finn did not try to influence those decisions; and Finn did not advise him with respect to, or participate in, his investigation or in Poux's arrest or prosecution in Nassau County. (Id. at 317-19; Gross Decl., Ex. G at 316, 333-34; Hatch Decl., Ex. LL at 321-27, 333, 345, 373). Finn

17

testified that he never attempted to influence or interject himself into Schepis's investigation or arrest of Poux and that Schepis did not seek his assistance in effecting the arrest or in the prosecution of Poux in Nassau County. (Hatch Decl., Ex. NN at 575-76, 686).

Schepis testified that prior to Poux's arrest, he had spoken with White several times since their cases involved joint suspects. (Gross Decl., Ex. G at 159, 161-62, 232). During his deposition, White testified that Schepis had requested that he provide him with photographs or surveillance video from the Citibank branches located in Nassau County, (Ex. E at 252), but that he did not ask Nassau County for the information they recovered from their investigation because "[w]hat happened in Nassau County was Nassau County's issues and what happened in Suffolk County was [his]." (Ex. E at 128).

b.    Poux's Arrest

Based upon Finn's sworn depositions, the copies of the forged checks made payable to "Camille Murray," the identification used to cash the checks and the photograph of the suspect attempting to cash the check at the Commack branch, on or about July 6, 2005, at approximately 4:00 p.m., Schepis arrested Poux near her place of employment at Sulon Hair Studio, located at 2116 Cortelyou Road, in the County of Kings, New York, and charged her with grand larceny in the third degree in violation of New York Penal Law Section 155.35 and possession of a forged instrument in the second degree in violation of New York Penal Law Section 170.25. (Plf. Exs. C and F; Petillo Decl., Exs. J and Q at 10; Gross Decl., Ex. W at 23; Hatch Decl., Ex. LL at 108, 154, 219-20, 225). Finn testified that he did not have any input into the charges brought against Poux in Nassau County. (Hatch Decl., Ex. NN, at 577, 686).

18

During her deposition, Poux testified that no excessive force had been used and no ethnically insulting remarks had been made to her during or following her arrest by Schepis. (Petillo Decl., Ex. M at 342). Prior to the arrest, Schepis did not know Poux. (Petillo Decl., Ex. N, at 53). Schepis testified that he did not speak with anyone from Suffolk County after Poux's arrest. (Gross Decl., Ex. G at 277).

Following Poux's arrest, Schepis collected her driver's license, which was different than the one that had been confiscated by Citibank; a statement for the account of the Discover credit card that had been confiscated by Citibank, (Petillo Decl., Ex. N at 250, 347-48; Gross Decl., Ex. G at 250-51 and Ex. W at 23-27); and a business card that Poux had signed "Camille," which he believed was in the same or similar handwriting as contained on the back of the counterfeit checks, (id. at 356; see Petillo Decl., Ex. G 313). Schepis testified that he never contacted the New York State Department of Motor Vehicles ("DMV") to ascertain whether Poux had ever reported her driver's license stolen or missing. (Petillo Decl., Ex. N at 312, 353). However, according to Schepis, he determined that the date that Poux's driver's license had been reissued was February 6th or 8th, 2005, after the license had been confiscated at Citibank's Commack branch on January 21, 2005. (Petillo Decl., Ex. N at 355; see Petillo Decl., Ex. S; Gross Decl., Ex W at 27).

During her deposition, Poux testified that she had an alibi, i.e., she had been working, on all of the dates and times during which the charged crimes occurred. (Gross Decl., Ex. A at 44). During his deposition, Schepis testified that upon his arrest of Poux, she did not provide him with the names of any alibi witnesses, (Petillo Decl., Ex. N at 221), although she did tell him that on or about December 20, 2004, after the date of the alleged crimes, somebody had broken into

19

her car and taken her pocketbook containing her driver's license and Discover credit card and that she had reported the theft to the 70th Precinct. (Petillo Decl. Ex. N at 346-47, 353; see Petillo Decl., Ex. M, at 132; Gross Decl., Ex. A at 132). According to Schepis, he contacted the 70th Precinct to attempt to confirm Poux's claim that her pocketbook had been stolen and that she was the victim of identity theft and a detective from the 70th Precinct with whom he had spoken told him that he had checked the database and that there was no report: (a) of any lost or stolen or damaged vehicle where a pocketbook had been stolen or (b) under Poux's name(s). (Petillo Decl., Ex. N at 252-54; Hatch Decl., Ex. LL at 344, 353-54).

During his deposition, Schepis testified that following Poux's arrest, he did no further investigation and had no further participation in this case except to testify before the grand jury. (Gross Decl., Ex. G at 113-14, 156; Hatch Decl., Ex. LL at 220).

   c.  The Prosecution

Natalie Grimaldi ("Grimaldi") testified before the Nassau County grand jury and during the Nassau County criminal trial that, at all relevant times, she was employed as the head teller at the Citibank branch in East Farmingdale and that on January 21, 2005, one of the tellers had called her over to review a transaction, at which time she seized the New York State driver's license, identification number 796 638 294, and Discover credit card ending in account number - 2896, both in the name of "Camille Murray," which had been presented as identification during the transaction. (Gross Decl., Ex. J at 13-15, 18 and Ex. K at 2-3). Grimaldi further testified before the grand jury that when she compared the characteristics of the individual depicted on the driver's license with the individual presenting the check, she was satisfied that they were the

same individual. (Gross Decl., Ex. J at 16). According to Grimaldi, when she returned to the work floor after consulting with the operations manager, the individual purporting to be Camille Murray had left the bank. (Id. at 17).

At his deposition, Finn testified that only one (1) set of identification had been recovered, by Zahedi, and that Grimaldi was incorrect about having recovered the identification. (Hatch Decl., Ex. NN at 556-58). According to Finn, the check involved in the transaction of which Grimaldi had testified had, in fact, been cashed on January 21, 2005 at approximately 11:26 a.m., prior to the confiscation of the identification by Zahedi at the Commack branch, and the identification utilized in that transaction had, therefore, not been confiscated. (Id. at 558, 568-73).

During her testimony before the Nassau County grand jury on March 6, 2006, Linda Prasad ("Prasad") testified that on December 20, 2004, she was employed as a teller at the Citibank branch in Franklin Square, New York; that on that date, she recorded information from a New York State drivers' license and Discover credit card on a check drawn on STS's account and made payable to "Camille Murray" in the amount of nine hundred seventy-five dollars and fifty cents ($975.50), which was later determined to be counterfeit; that she had checked the photograph on the driver's license presented by the person cashing the check with that person's appearance; and that she had thereafter disbursed the check amount to that person. (Hatch Decl., Ex. CC, at 26-27, 29-33).

Robert A. Lawley ("Lawley"), superintendent of transportation at STS, and Christa Patton ("Patton"), an assistant comptroller at Wilens & Baker, also testified before the Nassau County grand jury on March 6, 2006. (Hatch Decl., Ex. CC). Lawley and Patton testified that Poux was

never an employee of STS or Wilens & Baker, respectively, and that noone at their respective companies ever gave Poux permission to issue a payroll check to herself or issued a payroll check to Poux. (Id. at 40).

In addition, Doris Law ("Law"), a supervisor at the New York State Department of Motor Vehicles, testified before the Nassau County grand jury on March 6, 2006 that Poux's application for a replacement driver's license was dated February 8, 2005 and that a replacement photo license was mailed to her on February 15, 2005. (Hatch Decl., Ex. CC at 48). According to Plotkin, neither Finn nor anybody else from Citibank had anything to do with her investigation into the authenticity of Poux's driver's license and when it had been reissued to her. (Hatch Decl., Ex. MM at 229-32).

Robert Farrell, the area investigator for the northeast region of Discover card, testified before the Nassau County grand jury that Poux was an authorized user of a Discover credit card issued to Ralph which had been in effect in December 2004. (Hatch Decl., Ex. CC at 56). In addition, records received from Discover Financial Services ("Discover") pertaining to Poux's credit card account indicate, *inter alia*: (1) that on December 3, 2004 at 8:24 a.m., someone had called Discover seeking to deactivate the credit card, but not that the card had been reported lost or stolen; (2) that on March 19, 2006, the customer requested that a letter be sent to her attorney indicating that she had reported the card lost or stolen, but she was advised that Discover could not send such a letter since the account had only been deactivated, allowing the account to remain open but preventing use of the card until it was re-activated, (Petillo Decl., Ex. P); and (3) that on August 17, 2005, approximately eight (8) months after Poux allegedly reported her Discover credit card stolen, a charge in the amount of six hundred forty-nine dollars and eighteen

22

cents ($649.18) was made by Medgars Evers College, which Poux attended, (Nassau 56.1 Stat.,

¶¶ 57-59; Plf. Response to Nassau 56.1 Stat., ¶¶ 57-59; Petillo Reply, Ex. X). According to

Plotkin, Finn did not take any part in her decision to investigate the authenticity of Poux's

Discover credit card or whether it had ever been reported lost or stolen. (Hatch Decl., Ex. MM,

at 228-29).

On March 13, 2006, the grand jury of Nassau County indicted Poux on five (5) counts of

criminal possession of a forged instrument in the second degree in violation of New York Penal

Law Section 170.25 and one (1) count of grand larceny in the third degree in violation of New

York Penal Law Section 155.35. (Petillo Decl., Ex. K; Zwilling Aff., Ex. F).


d.    The Trial

By order dated July 25, 2006, the County Court of the State of New York, County of

Nassau (Carter, J.) found, *inter alia*, following an *in camera* inspection of the grand jury minutes,

that the evidence before the grand jury was legally sufficient to establish the crimes charged in

the Nassau County indictment. (Declaration of Diane C. Petillo in Further Support of

Defendants' Motion for Summary Judgment ["Petillo Reply"], Ex. W).

Plotkin caused a handwriting analysis to be done, but by report dated September 5, 2006,

Detective Joan Matrisciano, from the NCPD's Forensic Evidence Bureau, indicated that "[t]he

insufficient quantity of directly comparable known writing [was] inadequate for comparison.

Therefore no conclusion could be reached as to authorship of the questioned Camille Murray

signatures contained [on the seven (7) Nassau County counterfeit checks compared]." (Gross

Decl., Ex. Q). According to Plotkin, Finn did not have anything to do with her decision to have a

23

handwriting analysis done. (Hatch Decl., Ex. MM, at 227-28).

At some time close to the beginning of the Nassau County criminal trial, Plotkin learned through her conversations with Ruggieri, that Zahedi, like Grimaldi, was claiming to have seized a driver's license and Discover credit card in the name of "Camille Murray" on January 21, 2005. (Hatch Decl., Ex. MM at 83-4). According to Plotkin, she ultimately came to believe that Zahedi was the teller who had seized the identification because, *inter alia*, a supervisor from the Commack branch corroborated Zahedi's story, (Id. at 84-5), and she had confirmed with Schepis that only one set of identification had been seized, (id. at 155). During the criminal trial, Grimaldi was asked if she was mistaken in her testimony before the grand jury as to seizing the driver's license and Discover credit card in the name of "Camille Murray," to which she answered that "[i]t could be possible- -." (Gross Decl., Ex. K at 5). When pressed if she was "mistaken or not," Grimaldi responded: "Honestly, I don't remember. * * * I don't remember everything that happened." (Gross Decl., Ex. K at 5).

During the trial, the parties stipulated: (a) to the admission into evidence of six (6) photographs and one (1) check that had been cashed on December 9, 2004 at Citibank's Central Islip branch; and (b) that those photographs represented the person who cashed that check and who had committed all of the other check cashing transactions. (Hatch Decl., Ex. GG at 380-81; see Hatch Decl., Ex. MM at 271-72, 276, 282, 327-31).

On October 20, 2006, following a jury trial, Poux was acquitted of the Nassau County charges. (Plf. Ex. D; Petillo Decl., Ex. Q at 10). Although Finn's internal notes indicate that he had been active on the case on October 12, 13, 16, 17 and 18, 2006, (Hatch Decl., Ex. X), he never testified before the jury at trial. (Hatch Decl., Ex. NN at 576-77).

Plotkin testified that she had never heard Finn's name prior to Poux's case. (Hatch Decl., Ex. MM at 94). According to Plotkin, although Finn was her liaison with Citibank and, as such, acquired evidence and found witnesses used in the prosecution, Plotkin interviewed the witnesses she presented to the grand jury herself and Finn was not present during those interviews. (Id. at 101-02, 180-81). Plotkin further testified that she got the information she needed to prosecute the case from Finn and Schepis, (Id. at 176-78), but that neither Finn nor anyone else from Citibank ever influenced the manner in which she conducted her prosecution, insisted that she call certain witnesses, or interjected themselves into her prosecution of the case, (id. at 313-16). According to Plotkin, in prosecuting the case against Poux, she made all of the decisions in conjunction with other personnel in the Nassau D.A.'s Office. (Hatch Decl., Ex. MM at 315). Finn testified that he "had nothing to do with [the Nassau County] prosecution;" that he did not attempt to interject himself into Plotkin's prosecution of Poux; that the Nassau County D.A.'s Office never sought his counsel or advice as to how to conduct or prepare their investigation; and that he did not talk to any witnesses about their testimony at trial. (Hatch Decl., Ex. NN at 176, 576, 652, 686). In addition, Plotkin testified that she never became aware that Finn allegedly perjured himself or presented false evidence. (Hatch Decl., Ex. MM at 316).

B.      Procedural History

On July 17, 2009, plaintiffs commenced this action against the Suffolk County defendants, the Nassau County defendants and the Citibank defendants, pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988, alleging violations of Poux's constitutional rights, and asserting pendent state law claims seeking damages for false arrest and imprisonment, assault

25

and battery, malicious prosecution, negligence, intentional and negligent infliction of emotional distress and loss of consortium. By order dated May 4, 2010, the motions of the Nassau County defendants and Suffolk County defendants seeking dismissal of plaintiffs' complaint were granted to the extent that: (1) plaintiffs' Section 1983 and state law claims for false arrest, false imprisonment, assault and battery (plaintiffs' first through fourth causes of action in the original complaint) were dismissed in their entirety with prejudice; (2) plaintiffs' Section 1983 and state law malicious prosecution claims (plaintiffs' third, fourth, fourteenth and fifteenth causes of action in the original complaint) were dismissed with prejudice as against the D.A. defendants, Nassau County and Suffolk County; (3) plaintiffs' conspiracy claims (plaintiffs' seventh, tenth, twelfth and thirteenth causes of action in the original complaint) were dismissed in their entirety without prejudice and with leave to amend within thirty (30) days from the date of that Order; (4) plaintiffs' Section 1986 claim (eleventh cause of action in the original complaint) was dismissed in its entirety with prejudice; (5) plaintiffs' failure to intercede and Section 1981 claims (eighth and ninth causes of action in the original complaint) were dismissed with prejudice to the extent they are based upon acts or omissions occurring prior to July 17, 2006; (6) plaintiffs' state law negligence and intentional and negligent infliction of emotional harm claims (plaintiffs' seventeenth, nineteenth and twentieth causes of action in the original complaint) were dismissed with prejudice as against the Nassau County defendants; and (7) Ralph's loss of consortium claim (twenty-third cause of action in the original complaint) was dismissed with prejudice as against the Nassau County defendants, and the motions were otherwise denied.

Thereafter, plaintiffs' filed, *inter alia*, a third amended complaint, which is the operative complaint in this action. Accordingly, the following claims remain in this action: (1) plaintiffs'

malicious prosecution claims against Schepis pursuant to Section 1983 (second cause of action in third amended complaint), against White pursuant to Section 1983 (first cause of action in third amended complaint) and state law (ninth cause of action in third amended complaint) and against the County of Suffolk pursuant to state law (ninth cause of action in third amended complaint); (2) plaintiffs' failure to intercede and Section 1981 claims against the Suffolk County and Nassau County defendants (seventh and eighth causes of action in third amended complaint), to the extent those claims are based on conduct occurring on or after July 17, 2006; (3) plaintiffs' state law negligence and intentional and negligent infliction of emotional distress claims against the Suffolk County defendants (tenth, eleventh and twelfth causes of action in third amended complaint); (4) plaintiffs' Section 1983 <u>Monell</u> claims against Suffolk County and Nassau County (thirteenth and fourteenth causes of action in third amended complaint, respectively), except to the extent those claims are based upon the D.A. defendants' alleged malicious prosecution of Poux; (5) Ralph's state law loss of consortium claim against the Suffolk County defendants (fifteenth cause of action in third amended complaint); (6) plaintiffs' Section 1983 and 1985 conspiracy claims (third, fifth, sixth and fourth causes of action in third amended complaint); and (7) plaintiffs' Section 1988 claims for attorneys' fees against the Suffolk County and Nassau County defendants (sixteenth and seventeenth causes of action in third amended complaint, respectively).

All defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing plaintiffs' third amended complaint in its entirety and plaintiffs move pursuant to Rule 37 of the Federal Rules of Civil Procedure for sanctions against all defendants as a result of the alleged spoliation of evidence, i.e., surveillance videotapes.

27

## II. DISCUSSION

### A. Spoliation Motion

In their responses to plaintiffs' interrogatories, the Citibank defendants indicated, *inter alia*, that "[t]he bank branches in issue maintained their tapes and in accordance with Citibank tape retention policies, the images on those tapes were retained for 60-90 days before the tapes were recycled and placed back in service by the branch and taped over," and that:

> "Citibank's Crisis Management Unit ("CSIS") obtained, viewed and, where appropriate, printed a series of still photos from the tape, which stills were then forwarded along with the tape request form, as well as the original, actual tape if requested, to the investigator or person requesting that a tape be reviewed for their use in the normal course of Citibank business. If retention of the original tape was not requested, it was Citibank's practice that the tape from which the stills were taken would be sent back to the branch for retention and recycling in accordance with Citibank's policies.

> In this case CSIS was determined [sic] whether the tape requested captured any transactions occurring at or around the specific date and time of the incident in question. CSIS was not asked to look for a certain person and its search was not limited by a name, description or other identifying information. If there were no such transactions captured on the tape viewed, CSIS sent the tape back to the branch to be retained and then recycled in accordance with Citibank's tape retention policies and in the normal course of the business of these Citibank Defendants. If any such transactions were found, CSIS printed still photos of the customers involved on thermo paper if the tape was on VHS and individual stills if the tape was on a disc and sent the stills, the tape request and the original tape to Inv. Finn, in accordance with his written tape requests. As best he recalls, Inv. Finn had received four sets of stills from three VHS tapes (Central Islip 12/10/04, Melville 12/20/04 and Huntington 1/21/05) and one disc (Franklin Square 12/20/04) related to [Poux]. All of [Poux's] tapes, tape requests and stills, tapes were given * * * to law enforcement including Det. White and perhaps Det. Schepis, as well as ADA Plotkin. While on or about 10/16/06, Inv. Finn located the [Poux] Huntington tape that was mistakenly mixed in with tapes he had in his office related to other potential suspects in this fraudulent check ring case and other cases that were not being prosecuted, after given [sic] that tape to ADA Plotkin on the morning of 10/17/06, all four tapes had been given to Suffolk and Nassau and Inv. Finn did not have any other tapes related to this case.

> * * * Inv. Finn gave custody of the original tapes, stills and tape requests to the

28

> individuals listed above in or about early 2005 to 10/17/06 and Citibank
> Defendants have had no control over the original tapes, stills or tape requests
> since that time and have no knowledge as to the present whereabouts of those
> items."

(Plf. Ex. U, at 6-7; <u>see</u> Suffolk Exs. B). It is undisputed that the tapes and still photos taken from

the tapes referenced in the Citibank defendant's response were produced to plaintiffs. (See Plf.

Ex. U, at 16-18).

During his deposition, Finn testified that he had turned over all the tapes and discs he

received from Citibank's Crisis Management unit to the Nassau County and Suffolk County

D.A.'s Offices and that he was not in possession of any additional tapes or discs. (Gross Decl.,

Ex. F at 331, 337-38). In addition, during a hearing before the Honorable Thomas Feinman in

the Nassau County criminal case, Finn testified that he was not in possession of any video tapes;

that some of the tapes had been turned over to Nassau County or Suffolk County; and that some

of the tapes must have been recycled, i.e., returned to the financial center which would then reuse

it after sixty (60) days. (Gross Decl., Ex. V at 59-60; <u>see</u> Hatch Decl., Ex. NN at 338-39, 524,

646-48). According to Finn, the financial centers "were supposed to hold it, apparently they sent

it back out." (Gross Decl., Ex. V at 60; <u>see</u> Hatch Decl., Ex. NN at 338-39, 524, 646-48). In

addition, Finn testified that with respect to the videotape from Huntington on January 21, 2005,

for which he had a still photograph but no videotape, "some error may have been made, and [the

tape] may have been * * * sent back to be recycled rather than being held." (Hatch Decl., Ex.

NN at 647-48).

During his deposition, Schepis denied ever destroying any photographs or videotapes

relating to Poux. (Petillo Decl., Ex. N at 374). According to Schepis, no security videos or discs

from the Citibank branches in Nassau County allegedly involved in the crimes had ever been

provided to him. (Gross Decl., Ex. G at 188-91, 200-02, 210, 238-39, 242).

During his deposition, White testified that he maintained all of the surveillance material provided to him by Citibank. (Ex. G at 87).

Plaintiffs seek an order pursuant to Rule 37 of the Federal Rules of Civil Procedure: (1) entering a default judgment against all defendants based upon the spoliation of evidence; (2) declaring that lost and/or destroyed surveillance videotapes did not depict Poux; (3) precluding defendants from offering evidence at trial with respect to the lost and/or destroyed videotapes; and/or (4) instructing the jury that the video evidence was improperly lost and/or destroyed by defendants.

Rule 37(c)(1) provides, in relevant part:

> "If a party fails to provide information * * * as required by Rule 26(a) or (e), the party is not allowed to use that information * * * to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, * * * (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."

The sanctions available pursuant to Rule 37(b)(2)(A) include, *inter alia*, an order "(i) directing that * * * designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; * * * [and] (vi) rendering a default judgment against the disobedient party."

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). A court may impose

30

sanctions for the spoliation of evidence in the exercise of its inherent power to control litigation. See Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 106-07 (2d Cir. 2002); West, 167 F.3d at 779. Although a court has broad discretion in imposing sanctions for spoliation, the applicable sanction "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." West, 167 F.3d at 779. The sanction imposed should further the purposes of (1) deterring parties from engaging in spoliation; (2) placing the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restoring the prejudiced party to the same position he or she would have been in absent the spoliation of evidence by the opposing party. Id.; see also Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 107 (2d Cir. 2001). "In borderline cases, an inference of spoliation, *in combination with 'some (not insubstantial)) evidence' for the plaintiff's cause of action*, can allow the plaintiff to survive summary judgment." Byrnie, 243 F.3d at 107 (emphasis added). "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge." Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001).

Appropriate sanctions for the spoliation of evidence include, *inter alia*, giving an adverse inference instruction at trial. See, e.g. Residential Funding, 306 F.3d at 107; see also Byrnie, 243 F.3d at 107 ("The spoliation of evidence germane to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." (quotations and citation omitted)). "[A] party seeking [sanctions] based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a

31

culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding, 306 F.3d at 107 (quoting Byrnie, 243 F.3d at 107-12).

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd., 247 F.3d at 436; see also Byrnie, 243 F.3d at 107. "Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." Fujitsu Ltd., 247 F.3d at 436.

"[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to breach a duty to present it, or negligently." Residential Funding, 306 F.3d at 108 (quoting Byrnie, 243 F.3d at 109) (alterations and emphasis omitted). Sanctions "may be appropriate in some cases involving the negligent destruction of evidence because such party should bear the risk of its own negligence." Id. Sanctions "should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. * * * The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." Id. (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 75 (S.D.N.Y. 1991) (alterations omitted). "Although '[t]he sanction of an adverse inference *may be appropriate in some cases* involving the negligent destruction of evidence,' Residential Funding Corp., 306 F.3d at 108 (emphasis added), a sanction is by no means mandatory * * *." Twitty v. Salius, No. 11-448, 2012 WL

32

147913, at * 2 (2d Cir. Jan. 19, 2012) (summary order).

"'[R]elevant' in th[e] context [of a spoliation motion] means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed * * * evidence would have been of the nature alleged by the party affected by its destruction.'" Residential Funding, 306 F.3d at 108-09 (quoting Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998)). "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." Id. at 109. "Similarly, a showing of gross negligence in the destruction * * * of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Id. "Accordingly, where a party seeking an adverse inference adduces evidence that its opponent destroyed potential evidence * * * in bad faith or through gross negligence (satisfying the 'culpable state of mind' factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the 'relevance' factor)." Id.

"In the absence of bad faith or other sufficiently egregious conduct, it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." Orbit One Communications, Inc. v. Numerex Corp., 271 F.R.D. 429, 439 (S.D.N.Y. 2010) (internal quotations and citations omitted). "The party seeking sanctions in such cases must therefore affirmatively demonstrate that a reasonable trier of fact could find that the missing evidence would support his claims." Id. (internal quotations, alterations and citation omitted). "It is not

33

sufficient for the moving party merely to point to the fact that the opposing party has failed to produce requested information." Id. at 440.

The court's role in evaluating the "relevance" factor "is limited to insuring that the party seeking the [adverse] inference ha[s] adduced enough evidence of the contents of the missing materials such that a reasonable juror could find in its favor." Residential Funding, 306 F.3d at 109 n. 4 (emphasis omitted). "The burden falls on the 'prejudiced party' to produce 'some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files.'" Byrnie, 243 F.3d at 108 (quoting Kronisch, 150 F.3d at 128).

With respect to the Nassau County defendants and Suffolk County defendants, there is no evidence in the record from which a reasonable juror may infer, *inter alia*, that they ever had control over the allegedly lost or destroyed videotapes or played any part in the destruction of the videotapes. Indeed, plaintiffs allege only that the Citibank defendants "had lost/destroyed videos," (Affirmation of Richard Gross in Support of Motion for Sanctions Pursuant to Rule 37 [Gross Rule 37 Aff.], ¶ 24); that they "ha[ve] not been provided with the vast majority of the surveillance videos because they have been lost or destroyed by Citibank," (Id. at ¶ 26); and that "Citibank employees, knowing that the surveillance materials were to be preserved, nevertheless recycled them and therefore they are no longer available," (id. at ¶ 27). Moreover, for the reasons set forth below, there is no admissible evidence from which a reasonable juror may infer that the Citibank defendants were state actors and, thus, were "united in interest with the Citibank defendants and should therefore be held responsible for Citibank's spoliation of crucial evidence." (Plaintiff's Memorandum of Law in Reply to the Nassau and Suffolk Counties

34

Defendants' Opposition to Plaintiff's Motion for Sanctions for Spoliation of Evidence, at 2).

With respect to the Citibank defendants, there is no admissible evidence in the record from which a rational jury could find that at the time the videotapes had been recycled they knew or should have known that plaintiffs might commence an action seeking damages, *inter alia*, for Poux's malicious prosecution in the future and that the recycled videotapes might be relevant thereto. Whether or not the Citibank defendants knew or should have known that a criminal proceeding would be commenced against Poux, and thus, had an obligation to preserve the videotapes for use during the criminal proceeding, is of no relevance to this action, particularly since the Suffolk County court found no <u>Brady</u> violation with respect to those videotapes. Moreover, even assuming, *arguendo*, that the videotapes constituted exculpatory evidence relevant to Poux's defense during the criminal proceedings against her, and could somehow demonstrate that the Citibank defendants knew that Poux was not depicted thereon, for the reasons set forth below, plaintiffs cannot otherwise establish their claims against those defendants. Since plaintiffs have not produced any admissible evidence in support of their conspiracy claims, and, therefore, no reasonable jury could find in plaintiffs' favor on those claims, which are the only remaining claims against the Citibank defendants, the recycling of the videotapes by the Citibank defendants is insufficient to defeat summary judgment in favor of the Citibank defendants or to otherwise warrant sanctions in this case.

Furthermore, even assuming, *arguendo*, that the Citibank defendants had an obligation to preserve the videotapes, at most the record evidence demonstrates that the videotapes were recycled negligently pursuant to Citibank policy. Although such negligence may be sufficient to establish the "culpable state of mind" factor, there is no evidence in the record from which a

35

reasonable jury may infer that the videotapes were relevant to plaintiffs' claims against the Citibank defendants in this action. Plaintiffs have proffered no evidence to rebut the Citibank defendants' showing that many of the videotapes had been recycled after being reviewed by the Crisis Management unit because, *inter alia*, they did not contain any "hits" related to the counterfeit check transactions with which Poux had been charged and that three (3) of the four (4) videotapes that had contained "hits" relating to Poux had been produced to plaintiffs.

To the extent one (1) videotape containing a "hit" relating to Poux had been erroneously recycled, such videotape would have shown, according to plaintiffs, only that the person depicted therein did not physically resemble Poux. (See Gross Rule 37 Aff., at ¶ 28). Plaintiffs claim that such videotapes are relevant because they "can conclusively show that [Poux] was not the person who committed the crimes of which she was accused and that defendants knew full well that she was not." (Id. at ¶ 34; see also id. at ¶ 36 ("The loss/destruction of the videos substantially and irreparably prejudices the plaintiff since it leaves her with no reasonable avenue to challenge the accuracy of the defendants' assertion that she was visible on the videos or that she was the one that presented the forged checks.")). However, Poux was not prejudiced by the destruction of that videotape because, *inter alia*, her identity is not in dispute in this proceeding, i.e., since she was acquitted of the Nassau County charges after trial and the Suffolk County criminal proceeding to which that videotape related was dismissed against her prior to trial, whether or not she was the person who committed the counterfeit check transactions is irrelevant in this civil proceeding in which the focal issue is whether plaintiffs can establish that defendants' fraud, perjury or suppression of evidence caused her to be improperly indicted. In other words, the existence of the videotapes is what is in issue in this case, not the contents of those videotapes.

36

Thus, whether or not Poux was depicted on the missing videotape is immaterial to this proceeding since it would not affect the outcome of this action. Whatever benefit the contents of the videotapes may have had to the defense in the criminal trial against Poux is of no relevance to the instant civil action and, in any event, that issue was resolved against Poux by the County Court during the Suffolk County criminal proceeding which found, *inter alia*, no <u>Brady</u> violation. Accordingly, plaintiffs' motion seeking sanctions based upon the spoliation of the videotapes is denied in its entirety.

      B.     Summary Judgment Motions

         1.     Standard of Review

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); <u>see</u> <u>Ricci v. DeStefano</u>, 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.'" <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009)

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011), cert. denied, — S. Ct. —, 2012 WL 82013 (Mar. 19, 2012) (accord). "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that summary judgment is appropriate when the non-moving party has no evidentiary support for an essential element for which it bears the burden of proof).

If the district court determines that there is a genuine dispute as to a material fact, the court must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Spinelli, 579 F.3d at 166 (internal quotations and citation omitted), to determine whether there is a genuine issue for trial. See Ricci, 557 U.S. 557, 129 S.Ct. at 2677. "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Rojas, 660 F.3d at 104 (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505); see also Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (holding that a genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." (citation omitted)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 557 U.S. 557, 129 S.Ct. at 2677 (quoting Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

"The moving party bears the initial burden of demonstrating the absence of a genuine

issue of material fact," F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quotations and citation omitted); see also Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010) (accord), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011); see also Spinelli, 579 F.3d at 166. Once the moving party meets its burden, the nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. Spinelli, 579 F.3d at 166 (internal quotations and citations omitted); see also Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003) (alterations in original). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005) (quoting Matsushita Elec., 475 U.S. at 586, 106 S. Ct. 1348).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record * * *; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(e) provides, in relevant part, that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: * * * (2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting

39

materials– including the facts considered undisputed– show that the movant is entitled to it; * * *." Fed. R. Civ. P. 56(e). "Rule 56(e) * * * requires the nonmoving party to *go beyond the pleadings* and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file [as well as documents, electronically stored information, stipulations and other materials, see Fed. R. Civ. P. 56(c)(1)(A)],' designate 'specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324, 106 S. Ct. 2548 (emphasis added). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except the mere pleadings themselves * * *,*" Id. (emphasis added); see also Fitzgerald v. Henderson, 251 F.3d 345, 360-61 (2d Cir. 2001) ("In general, a party opposing a properly supported motion for summary judgment is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion."), unless the pleadings are verified in a manner "equivalent of the oath that would be given with respect to an affidavit," Fitzgerald, 251 F.3d at 361, and assert factual matters other than upon "information and belief." Id. "In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (internal quotations and citations omitted). "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory * * * or based on speculation." Id. at 310; see also Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (holding that the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment).

"Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern

and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact. * * * If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003); see also Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) ("A party opposing summary judgment must respond with a statement of facts as to which a triable issue remains. See Local Rule 56.1(b). The facts set forth in a moving party's statement 'will be deemed to be admitted unless controverted' by the opposing party's statement. Local Rule 56.1(c)."); Local Civ. R. 56.1(a)-(c). Local Civil Rule 56.1(d) requires that "[e]ach [56.1] statement by the movant or opponent * * *, including each statement controverting any statement of material fact, [] be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Courts may decline to "consider as disputed any statement [in the movants' Local Rule 56.1 statement] supported by admissible evidence to which [the non-movant] objects, but does not support with evidence, * * *, in perfect accordance with Local Rule 56.1(d), * * *." Feis v. United States, 394 Fed. Appx. 797, 799 (2d Cir. Oct. 1, 2010) (summary order) (quotations and emphasis omitted). "[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." Holtz, 258 F.3d at 74. "[A]llegations * * * cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement." Id. at 73. "[W]here there are no[] citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion," Id. at 73-4 (quotations and citations omitted), and review the record independently. Id. at 74.

I have exercised my discretion to conduct an independent review of the record to ascertain whether there is a triable issue of material fact in this case. To the extent any of the parties' assertions in their 56.1 Statements and Counter-Statements do not find support in any admissible evidence in the record, those assertions are disregarded.

### 2. Malicious Prosecution Claims (First, Second and Ninth Causes of Action in Third Amended Complaint)

"In order to prevail on a Section 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, * * *, and must establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010); see also Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002) (accord). To establish a claim of malicious prosecution under New York law, a plaintiff must demonstrate: (1) that the defendant commenced or continued a criminal proceeding against him or her (2) without probable cause and (3) out of malice; and (4) that the criminal proceeding terminated in his or her favor. See Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003); Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003); Martinez v. City of Schenectady, 97 N.Y.2d 78, 84, 735 N.Y.S.2d 868, 761 N.E.2d 560 (2001). For purposes of this motion, the first and fourth elements are not in dispute, i.e., White and Schepis commenced criminal proceedings against Poux which were ultimately terminated in her favor.

### a. Probable Cause

"In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief

that he has lawful grounds for prosecuting the defendant in the manner complained of."

Rounseville v. Zahl, 13 F.3d 625, 629-30 (2d Cir. 1994) (internal quotations and citations omitted); see also Colon v. New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983) (holding that probable cause to prosecute consists of 'such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty.") "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino, 331 F.3d at 72; see also Dickerson v. Napolitano, 604 F.3d 732, 751 (2d Cir. 2010) (accord).

"In New York, the fact that the Grand Jury returned an indictment against [the plaintiff] creates a presumption that his arrest and indictment were procured with probable cause." Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994); see also Manganiello, 612 F.3d at 162 (accord). "That presumption may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Manganiello, 612 F.3d at 162 (quoting Colon, 60 N.Y.2d 78, 468 N.Y.S.2d at 456); see also McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006). "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." Savino, 331 F.3d at 73; see also Rothstein v. Carriere. 373 F.3d 275, 284 (2d Cir. 2004) ("The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct * * *.") "In order to survive a motion for summary judgment on the malicious prosecution claim, [the plaintiff] must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." Savino, 331 F.3d

at 73. The presumption of probable cause is not rebutted "with mere 'conjecture' and 'surmise'." Id. (citing Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991)); see also Sclafani v. Spitzer, 734 F. Supp. 2d 288, 299 (E.D.N.Y. 2010) ("mere conjecture and surmise than an indictment was procured as a result of conduct undertaken in bad faith cannot overcome the presumption of probable cause created in an indictment." (quotations and citation omitted)); Fernandez v. DeLeno, 71 F. Supp. 2d 224, 229 (S.D.N.Y. 1999) ("To survive a motion for summary judgment [on a malicious prosecution claim], plaintiff must present admissible facts and may not rely on bare allegations of facts, ultimate or conclusory facts, or legal conclusions.")

"[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996) (quotations and citations omitted); see also Kent v. Thomas, No. 10-3688-cv, 2012 WL 689127, at * 1 (2d Cir. Mar. 5, 2012) (summary order). However, "[i]n order for probable cause to dissipate, the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact." Lowth, 82 F.3d at 571; see also Husbands ex rel. Forde v. City of New York, 335 Fed. Appx. 124, 128 (2d Cir. June 30, 2009) (summary order); Carrow v. City of New York, No. 06 Civ. 1436, 2010 WL 1009996, at * 8 (S.D.N.Y. Mar. 17, 2010). "[T]he question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the * * * Defendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." Rae v. County of Suffolk, 693 F. Supp. 2d 217, 227 (E.D.N.Y. 2010). "[D]efendants are not obliged to exonerate [the] plaintiff or uncover exculpatory evidence, but the 'failure to make a further inquiry when a reasonable person would

44

have done so may be evidence of lack of probable cause." Lawrence v. City Cadillac, No. 10

Civ. 3324, 2010 WL 5174209, at * 6 (S.D.N.Y. Dec. 9, 2010) (quoting Lowth, 82 F.3d at 571).

No rational fact finder could conclude, under the totality of the circumstances, that either

Schepis or White lacked probable cause to arrest Poux in light of, *inter alia*, the sworn

depositions by complaining witnesses, the Affidavits of Forgery and the counterfeit checks with

Poux's identification recorded on the back. Upon Poux's indictments by the grand juries in both

Nassau County and Suffolk County, a presumption of probable cause to prosecute Poux arose; "a

presumption that can only have been enhanced by the [Nassau County and Suffolk County]

Court[s'] *in camera* review" of the grand jury minutes and subsequent determinations that the

evidence presented to the grand jury was legally sufficient. See, e.g. Reyes v. City of New York,

No. 10-cv-1838, 2012 WL 37544, at * 4-5 (E.D.N.Y. Jan. 9, 2012). Plaintiffs have adduced no

admissible evidence: (1) that Schepis or White discovered any facts between Poux's arrest and

the commencement of the prosecution against her that would support a finding that the probable

cause that existed at the time of her arrest had dissipated, or (2) that either Schepis or White

failed to investigate as a reasonable person would have done or otherwise acted in bad faith in

procuring the respective indictments against her. With respect to Schepis, the undisputed

evidence demonstrates, *inter alia*: (1) that Schepis was never in possession of the surveillance

videotapes allegedly depicting a woman who bore little physical resemblance to Poux and (2)

that Schepis adequately investigated Poux's alibi but was unable to confirm that her pocketbook

and identification had been stolen prior to any of the counterfeit check transactions with which

she was charged. With respect to White, *inter alia,* there is no admissible evidence in the record

from which a rational juror could find that he testified before the grand jury or was aware of

Poux's alibi prior to her indictment and, indeed, the undisputed evidence demonstrates that plaintiffs did not serve Poux's Notice of Alibi until after the indictment was returned against her in Suffolk County.

Although plaintiffs contend that both Schepis and White should have done more to investigate the charges against Poux, the record demonstrates that neither officer "deviated egregiously" from accepted practices of investigation nor otherwise engaged in conduct that "shocks the conscience". Dukes v. City of New York, 879 F.Supp. 335, 342 (S.D.N.Y. 1995) (quotations and citation omitted); see also Simmons v. Chemung County Department of Social Services, 770 F. Supp. 795, 801 (W.D.N.Y. 1991), aff'd, 948 F.2d 1276 (2d Cir. 1991) ("It is not enough for the plaintiff to show that the [defendants] could have done more or could have disclosed more * * *. Instead, the plaintiff must demonstrate that the defendants deviated egregiously from accepted practices of investigation or otherwise engaged in conduct that shocks the conscience." (quotations and citations omitted)). "'[T]he mere assertion of an alibi, and even the failure to investigate such an alibi to plaintiff's satisfaction, does not overcome the existence of probable cause to prosecute. . .' where there is no evidence of fraud or suppression of evidence." Dukes, 879 F. Supp. at 343 (quoting Gisondi v. Town of Harrison, 120 A.D.2d 48, 53, 507 N.Y.S.2d 419 (2d Dept. 1986), aff'd, 72 N.Y.2d 280, 532 N.Y.S.2d 234, 528 N.E.2d 157 (1988)) (alterations in original). "Police officers need not conduct an investigation which exculpates an arrestee." Id.; see also Martinez v. City of New York, 340 Fed. Appx. 700, 702 (2d Cir. July 27, 2009) ("Arresting officers * * * are not required to investigate a claim of innocence– even a claim of innocence that is based on mistaken identity."); Panetta v. Crowley, 460 F.3d 388, 395-96, 398 (2d Cir. 2006) ("[T]he fact that an innocent explanation may be

consistent with the facts alleged. . . does not negate probable cause, * * *, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause. * * * Once an officer has probable cause, he or she is neither required nor allowed to continue investigating, sifting and weighing information." (quotations and citations omitted)). Absent evidence of deliberate malfeasance or gross negligence, a claim that a law enforcement officer could have done a more thorough investigation, or even that the officer made mistakes in conducting an investigation, is insufficient to establish a cause of action for malicious prosecution. See, e.g. Reyes v. City of New York, No. 10-cv-1838, 2012 WL 37544, at * 5 (E.D.N.Y. Jan. 9, 2012) ("Police officers are not obligated to pursue every possible avenue that may exonerate the defendant, * * * and the failure to conduct an exhaustive investigation is not misconduct."); Woodley v. City of New York, No. CV-09-5709, 2010 WL 4704468, at * 10-11 (E.D.N.Y. Nov. 12, 2010) (finding that evidence suggesting only that the detective could have conducted a more thorough investigation is insufficient to rebut the presumption of probable cause arising from the grand jury indictment); Gil v. County of Suffolk, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) ("Any alleged failure to conduct further investigation or apply all procedures that could have been followed does not amount to fraud, bad faith or the suppression of evidence and is insufficient to overcome the presumption [of probable cause resulting from an indictment].") Since there is no admissible evidence that White, Schepis, or any other officer, acted in bad faith or egregiously, Poux has not overcome the presumption of probable cause that arises from her indictment and, therefore, no reasonable jury could find in her favor on her malicious prosecution claims. See Savino, 331 F.3d at 75.

Plaintiffs cite to only two (2) cases from this Circuit in support of their contention that

Schepis and White can be liable for malicious prosecution based upon their alleged failure to independently investigate the facts. Plaintiffs cite Kerman v. City of New York ("Kerman II"), 374 F.3d 93, 99 (2d Cir. 2004), for the proposition that a police officer "is not free to disregard plainly exculpatory evidence." (Plf. Nassau Opp., at 13). That proposition, however, was not a holding in that case. Rather, the Second Circuit was merely summarizing its prior holding on a previous appeal in Kerman v. City of New York ("Kerman I"), 261 F.3d 229, 240 (2d Cir. 2001). In Kerman I, the plaintiff appealed, *inter alia*, the grant of summary judgment dismissing his Fourth Amendment unreasonable seizure claim challenging the decision of police officers to hospitalize him on qualified immunity grounds. In that case, the parties agreed that the police officers did not have to rely exclusively on a 911 call in deciding the hospitalize the plaintiff and the Second Circuit found, *inter alia*, based upon its review of the investigatory steps taken by the officers once they had entered the plaintiff's apartment, that the investigation failed to corroborate the gravamen of the anonymous 911 call and that the officers deliberately ignored two (2) opportunities to confirm the seriousness of the plaintiff's condition. The Second Circuit, thus, found that the police officers "not only failed to reasonably investigate [the plaintiff's] mental state, they also grossly misjudged the situation as it unfolded before them." Id. at 241. To the contrary, upon Poux's arrest, Schepis recovered Poux's reissued driver's license and a Discover credit card matching the ones recorded on the backs of the counterfeit checks, thus corroborating Finn's complaint against her, and adequately investigated her claimed alibi. Moreover, White testified that he spoke with investigators from Citibank and complaining witnesses other than Finn during his investigation. Unlike in Kerman I, therefore, the record is bereft of any evidence indicating any "gross misjudg[ment]" by Schepis or White in their

48

investigations of Poux. See, e.g. Panetta, 460 F.3d at 398-99 (distinguishing Kerman).

The other case cited by plaintiffs, Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007), is also distinguishable from this case. In that case, there was evidence, *inter alia*, that the officers had affirmatively concealed exculpatory videotapes; falsely indicated to the plaintiff that the videotapes had depicted a man with tattoos like the plaintiff's in order to invoke a confession from him; and failed to abide by police rules regarding the storage and processing of exculpatory evidence, thereby impeding the state attorney's access to the evidence. Id. at 206. In that case, unlike this one, the officers took no steps to check the plaintiff's identity against allegedly exculpatory evidence readily available to them. To the contrary, there is no admissible evidence in the record from which it may be inferred, *inter alia*, that any exculpatory evidence was ever in Schepis's possession or readily available to him, or that Schepis or White engaged in any affirmative wrongdoing, e.g., actively concealed or conspired to conceal the exculpatory evidence.

To the extent plaintiffs base their malicious prosecution claim upon Schepis's or White's investigation, or lack thereof, after the respective indictments, such a claim fails because "[o]nce the grand jury indicted [Poux], control of the prosecution passed to the prosecutor and was no longer within [Schepis's or White's] authority." Bernard, 25 F.3d at 104. "Once control of a prosecution has passed to a prosecuting attorney, a police officer may only be liable for 'continuing' the prosecution if he or she insists upon or urges further prosecution." Burt v. Aleman, No. 05-CV-4493, 2008 WL 1927371, at * 5 (E.D.N.Y. Apr. 30, 2008) (internal quotations, alterations and citations omitted). The record is devoid of any admissible evidence that either White or Schepis even suggested, much less insisted upon or urged, the prosecution of

49

Poux following the indictments in their respective counties. Absent any such evidence, neither White nor Schepis can be held liable upon a theory that they continued the prosecution of Poux's criminal proceedings in Suffolk County and Nassau County, respectively, following the indictments, even if they later learned of and failed to disseminate exculpatory information. See, e.g. id. at * 6.

Moreover, insofar as the Suffolk County prosecutors did not present the December 9, 2004 videotape from Citibank's Central Islip branch to the grand jury, it was within their discretion and authority to decide what evidence to present to the grand jury and they had "no duty to present every item of arguably exculpatory evidence in seeking an indictment." Savino, 331 F.3d at 75; see also United States v. Williams, 504 U.S. 36, 52, 112 S. Ct. 1735, 118 L. Ed. 2d 352 (1992) (holding that prosecutors do not have a constitutional obligation to provide exculpatory evidence to a grand jury); Parisi, 2009 WL 4405488, at * 10 ("The simple act of not disclosing to the grand jury all evidence that could potentially benefit the accused at a grand jury hearing does not necessarily rise to the level of bad faith. * * * [T]he police and prosecutors cannot be said to have improperly concealed evidence every time the plaintiff is able to show that they could have done more or could have disclosed more.") Moreover, any decision not to present the arguably exculpatory information to the grand jury would, itself, not amount to conduct undertaken in bad faith. Savino, 331 F.3d at 75.

Since the record, taken as a whole, cannot lead a rational jury to find for plaintiffs on their malicious prosecution claims against White and Schepis, there is no genuine issue for trial and summary judgment dismissing those claims is appropriate.

b.     Malice

Plaintiffs have also failed to establish that either Schepis or White acted with malice in commencing and/or continuing the respective criminal proceedings against Poux. Malice means that the defendant must have commenced or continued the criminal prosecution due to "a wrong or improper motive, something other than a desire to see the ends of justice served." Lowth, 82 F.3d at 573 (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 502-03, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975 (1978)). "[T]here must be a showing of some deliberate act punctuated with awareness of conscious falsity to establish malice." Williams v. City of Mount Vernon, 428 F. Supp. 2d 146, 158 (S.D.N.Y. 2006) (internal quotations and citation omitted). Since there is no admissible evidence in the record from which a reasonable jury may infer that either Schepis or White acted for any improper purpose, i.e., other than to see that the ends of justice were served, in commencing and continuing the respective criminal proceedings against Poux, summary judgment dismissing plaintiffs' malicious prosecution claims in their entirety is appropriate.

For all of the foregoing reasons, the branches of the Nassau County defendants' and Suffolk County defendants' motions seeking summary judgment dismissing plaintiffs' federal and state law malicious prosecution claims are granted and those claims (first, second and ninth causes of action in the third amended complaint) are dismissed in their entirety with prejudice.[4]

3.     Conspiracy Claims (Third through Sixth Causes of Action in Third Amended Complaint)

---

[4] In light of this determination, it is unnecessary to consider the branches of the Nassau County defendants' and Suffolk County defendants' motions seeking summary judgment dismissing plaintiffs' Section 1983 claims against White and Schepis based upon the defense of qualified immunity.

a.     Statute of Limitations

For claims alleging civil conspiracies, including conspiracies to violate an individual's civil rights, "the cause of action accrues and the statute of limitations begins to run from the time of commission of the overt act alleged to have caused damages." Chodos v. Federal Bureau of Investigation, 559 F.Supp. 69, 74 (S.D.N.Y. 1982), aff'd, 697 F.2d 289 (2d Cir. 1982); see also Pearl v. City of Long Beach, 296 F.3d 76, 87 (2d Cir. 2002) ("[A]ccrual of a cause of action based on specific acts of which a plaintiff was aware cannot be postponed * * * simply by alleging that the acts were taken pursuant to a conspiracy."); Pinaud v. County of Suffolk, 52 F.3d 1139, 1156-57 (2d Cir. 1995) ("[W]hen a plaintiff knows or ought to know of a wrong, the statute of limitations on that claim starts to run, and the later awareness that the actionable wrong was also part of a conspiracy does not expand the statutory time limit."); Singleton v. City of New York, 632 F.2d 185, 192 (2d Cir. 1980) (holding that the statute of limitations accrues at the time of the wrongful act and that the existence of a conspiracy does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs); Afshar v. Procon Inc., 442 F.Supp. 887, 891 (S.D.N.Y. 1977), aff'd, 580 F.2d 1044 (2d Cir. 1978) (holding that the statute of limitations for civil conspiracy claims commences to run upon the commission of the overt act causing damage).

The record evidence indicates, *inter alia*: (a) that Citibank closed its investigation of Poux on April 20, 2005, although it continued to monitor the criminal proceedings; (b) that with the exception of the four (4) videotapes containing "hits" relating to Poux, the other available surveillance videotapes and discs were reviewed, retained and recycled within ninety (90) days

52

after January 21, 2005, the last date of an alleged fraudulent check transaction, i.e., by April 21, 2005, in accordance with Citibank policy; (c) that all evidence was presented to the Suffolk County defendants and/or Nassau County defendants no later than March 28, 2005, with the exception of the one (1) videotape that was provided to Plotkin on October 16, 2006; and (d) that all grand jury testimony occurred no later than June 16, 2006. Accordingly, to the extent plaintiffs' conspiracy claims are based upon their investigation of Poux, failure to preserve the videotapes or Finn's testimony before the grand jury, all of which occurred more than three (3) years prior to plaintiffs' filing of the original complaint, i.e., before July 17, 2006, and of which plaintiffs knew prior to that date, those claims are dismissed in their entirety as time-barred.[5] Thus, the only evidence in the record of any overt acts by the Citibank defendants on or after July 17, 2006 is that Finn participated in the trial of the Nassau County proceeding for five (5) days in October 2006. (Hatch Decl., Ex. X).

### b.    Unconstitutional Injury

In any event, plaintiffs cannot establish a Section 1983 conspiracy claim, which requires them to demonstrate: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). In order to establish a conspiracy claim

---

[5] Plaintiffs concede that to the extent their conspiracy claims are based upon Poux's arrest, those claims are time-barred. (Plaintiffs' Memorandum of Law in Opposition to the Citibank Defendants' Motion Pursuant to Fed. R. Civ. P. 56 ["Plf. Citibank Opp."], at 5). Accordingly, plaintiffs' conspiracy claims are limited to those based upon her prosecution. (Id.)

under 42 U.S.C. § 1985(3), a plaintiff must demonstrate: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007); Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). Accordingly, under both statutes, plaintiffs must demonstrate the existence of a conspiracy, an overt act in furtherance thereof and damages. "A Section 1985(3) 'conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" Cine SK8, 507 F.3d at 791-92 (quoting Thomas, 165 F.3d at 146); see also Palmieri v. Lynch, 392 F.3d 73, 86 (2d Cir. 2004).[6]

"Although a conspiracy 'need not be shown by proof of an explicit agreement,' a plaintiff must demonstrate at least that 'parties have a tacit understanding to carry out the prohibited conduct.'" Cine SK8, 507 F.3d at 792 (quoting Thomas, 165 F.3d at 146 (internal quotations and citation omitted)). "To defeat a motion for summary judgment [on a conspiracy claim], the non-moving party may not rely on conclusory allegations or unsubstantiated speculation." Pacicca v. Stead, No. 10-1069, 2011 WL 5515954, at * 1 (2d Cir. Nov. 14, 2011) (summary order) (internal quotations, alterations and citation omitted). "[A]bsent an underlying constitutional violation on which to base a § 1983 conspiracy claim, a plaintiff's conspiracy claim fails as a matter of law." AK Tournament Play, Inc. v. Town of Wallkill, No. 09 Civ. 10579, 2011 WL 197216, at * 3

---

[6] Plaintiffs consent to dismissal of their Section 1985 conspiracy claim. (Plf. Nassau Opp., at 21; Plf. Citibank Opp., at 14). Accordingly, plaintiffs' Section 1985 conspiracy claim (fourth cause of action in third amended complaint) is dismissed in its entirety with prejudice.

(S.D.N.Y. Jan. 19, 2011), aff'd, 444 Fed. Appx. 475 (2d Cir. Oct. 28, 2011).

Since plaintiffs have not established a claim for malicious prosecution, or any other constitutional violation, they cannot maintain a Section 1983 conspiracy claim as a matter of law. See, e.g. Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001); Larocco v. Jackson, No. 10-cv-1651, 2012 WL 760396, at * 3 (E.D.N.Y. Mar. 8, 2012).

In any event, the evidence in the record, viewed in the light most favorable to plaintiffs, is insufficient to establish a genuine issue of fact as to the existence of any conspiracy, i.e., there is no admissible evidence from which a reasonable inference may be drawn, *inter alia*, that any of the defendants had even a tacit understanding to prosecute Poux without probable cause. At most, the record evidence demonstrates that Finn, as the complaining witness on behalf of Citibank, cooperated with White's and Schepis's respective investigations and the criminal prosecutions, and that White and Schepis shared information on their parallel investigations with each other, but independently conducted their own investigations, none of which is sufficient to establish the existence of a conspiracy. See, e.g. Scotto v. Almenas, 143 F.3d 105, 115 (2d Cir. 1998) (finding that evidence of several communications between the plaintiff's parole officer and the non-government defendants established no more than that the non-government defendants cooperated with the parole officer's investigation into the plaintiff's alleged parole violation which was insufficient to establish a Section 1983 conspiracy claim); San Filippo v. U.S. Trust Co. of New York, Inc., 737 F.2d 246, 256 (2d Cir. 1984) (finding that the plaintiff could not maintain his conspiracy claims because "at no point in the proceedings ha[d] [he] alleged one shred of evidence in support of his conclusory assertion of conspiracy, beyond the fact that [the prosecutor] and [the detective] met with [the private] defendants prior to their grand jury

55

testimony * * * which [is] routine and necessary in the preparation of evidence."); Zahrey v. City of New York, No. Civ.A. 98-4546, 2009 WL 1024261, at * 11 (S.D.N.Y. Apr. 15, 2009) (finding that the plaintiff could not maintain a conspiracy claim absent evidence of any agreement other than the fact that the individual defendants worked together during the plaintiff's criminal prosecution).

"Even if a civilian complainant is ultimately incorrect in his belief as to whether a person is committing a crime, he need only have had a reasonable basis for this belief in order to have the probable cause necessary to defeat a malicious prosecution or false arrest [conspiracy] claim." Pacicca, 2011 WL 5515954, at * 2 (alterations and citation omitted). Given, *inter alia*, the fact that two (2) forms of Poux's identification were recorded on the back of the counterfeit checks, it was reasonable for Finn to believe that Poux was one (1) of the perpetrators of the counterfeit check transactions. "[A] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution." Mesiti v. Wegman, 307 A.D.2d 339, 340, 763 N.Y.S.2d 67 (2d Dept. 2003) (quotations and citations omitted); see also Barrett v. Watkins, 82 A.D.3d 1569, 1572, 919 N.Y.S.2d 569 (3d Dept. 2011) ("merely furnishing information to law enforcement authorities, who are then free to exercise their own judgment as to whether criminal charges should be filed, and giving testimony at a subsequent trial are insufficient to establish liability."). Absent evidence that the complaining witness "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act," liability cannot be imposed. Mesiti, 307 A.D.2d at 340, 763 N.Y.S.2d 67 (quotations and citation

omitted); see also Barrett, 82 A.D.3d at 1572, 919 N.Y.S.2d 569.

Plaintiffs have presented no evidence to contradict the testimony of all defendants, *inter alia*, that Finn, as a complaining witness and liaison with Citibank, only provided Schepis and White with certain information and evidence in the Citibank defendants' possession and supplied them with supporting depositions; that the prosecutions were independently conducted by the respective district attorney's offices; and that the type of information and evidence requested of Finn is the type of evidence and information ordinarily received and/or requested from private complainants in similar prosecutions. "Whatever [Finn's] role [was] in initially implicating [Poux] in any misconduct, there can be no liability flowing to [the Citibank defendants] based upon [the Nassau County and Suffolk County defendants'] subsequent and independent decision to pursue a criminal prosecution against [Poux]." Heaning v. NYNEX-New York, 945 F. Supp. 640, 651 (S.D.N.Y. 1996); see also Barrett, 82 A.D.3d at 1572 (finding that the defendants' conduct in providing the police with information regarding the incident, supplying them with a supporting deposition and testifying at the criminal trial was, as a matter of law, insufficient to impose liability). Since the record, taken as a whole, cannot lead a rational jury to find for plaintiffs on their conspiracy claims, the branches of defendants' motions seeking dismissal of plaintiffs' conspiracy claims are granted and those claims (third through sixth causes of action in third amended complaint) are dismissed in their entirety with prejudice.[7]

Plaintiffs cite to Harris v. Sec. Co. of 1370 Sixth Ave., No. 94 Civ. 2599, 1996 WL 556927, at * 3 (S.D.N.Y. Oct. 1, 1996), an unreported case from the United States District Court,

---

[7] Since the only claims asserted against the Citibank defendants in the third amended complaint are the conspiracy claims, the action is dismissed in its entirety with prejudice as against the Citibank defendants.

Southern District of New York, for the proposition that "joint activity with the state may occur when, for example, the police arrest a suspect solely based on security guard's request, without making any independent investigation' [sic] if the matter," (Plf. Citibank Opp., at 9), and claim that "[t]hat is precisely what occurred here." (Id.) In Harris, the court further held, *inter alia*, that "[t]o constitute state action * * * [t]he police must allow the security guard's judgment about whether probable cause exists to be substituted for their own." 1996 WL 556927, at * 3. Harris, however, actually supports granting summary judgment dismissing plaintiffs' conspiracy claims because the Harris court found no state action on the part of the security guard in light of plaintiff's allegations that he had been detained by the security guard and arrested only after a police officer had arrived and had "a conversation with the defendants." Id. The court found that "[s]uch a conversation, suggesting independent investigation by the police, belies the notion that [the plaintiff] was arrested solely at the defendants' instruction." Id. In other words, summary judgment dismissing the conspiracy claims is appropriate where there is undisputed evidence that the police conducted an independent investigation. See id. Since, *inter alia*, the undisputed evidence in the record indicates that both Schepis and White conducted independent investigations prior to their arrests and the prosecutions of Poux, e.g., they interviewed complaining witnesses, compared the signatures of Poux with those recorded on the backs of the counterfeit checks and/or on the confiscated identifications, confirmed that Poux resided at the address recorded on the backs of the counterfeit checks, etc., summary judgment dismissing plaintiffs' Section 1983 conspiracy claims is warranted.

M&D Sportswear Inc. v. PRL USA Holdings, Inc., No. 02 Civ. 1562, 2002 WL 31548495, at * 3-4 (S.D.N.Y. Nov. 14, 2002), another unreported case cited by plaintiffs, is

distinguishable because, *inter alia*, that case involved a motion to dismiss, as opposed to a motion for summary judgment; the plaintiff alleged that the district attorney's investigation had been funded by the private defendants and that representatives of the private defendants accompanied the police on their raid of the plaintiff's premises; and the district attorney's office admitted that its decision to destroy the seized apparel was based entirely upon the private defendants' representations. Id. at * 4. Accordingly, the M&D court found that the allegations in the complaint were sufficient to find that the private defendants "effectively controlled the investigation, the decision to prosecute, and the failure to retrieve the seized apparel before it was destroyed." Id. There is no evidence of such control by the Citibank defendants over Poux's prosecution in either Nassau County or Suffolk County.

For all of the foregoing reasons, the Citibank defendants' motion for summary judgment dismissing the third amended complaint against them and the branches of the Nassau County defendants' and Suffolk County defendants' motions seeking summary judgment dismissing plaintiffs' conspiracy claims against them are granted, the third amended complaint is dismissed in its entirety with prejudice as against the Citibank defendants and plaintiffs' conspiracy claims (third through sixth causes of action in the third amended complaint) are dismissed in their entirety with prejudice.

4.     Eighth Cause of Action in Third Amended Complaint

In their eighth cause of action in the third amended complaint, plaintiffs allege, *inter alia*, that defendants: deprived Poux of her First Amendment right to have access to and seek redress in the courts; engaged in a cover up in order to conceal the wrongful and unlawful conduct; and

made efforts to conceal the truth from Poux.

a.   Section 1981

42 U.S.C. § 1981(a) provides, in relevant part, that "[a]ll persons * * shall have the same right * * * to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains [and] penalties * * * of every kind, and to no other." In order to establish a claim based on Section 1981(a), the plaintiff must demonstrate, *inter alia*, that the defendant discriminated against him or her on the basis of his or her race; that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. Tolbert v. Queens College, 242 F.3d 58, 69 (2d Cir. 2001). Thus, a plaintiff must demonstrate: (1) that he or she is a member of a racial minority; (2) that the defendant intended to discriminate against the plaintiff on the basis of his or her race; and (3) that the discrimination concerned one or more of the activities enumerated in Section 1981(a). See Brown v. City of Oneonta, N.Y., 221 F.3d 329, 339 (2d Cir. 2000); Lauture v. International Business Machines Corp., 216 F.3d 258, 261 (2d Cir. 2000). Section 1981 "only prohibits intentional racial discrimination." Brown, 221 F.3d at 339; see also Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988) ("Section 1981 was intended to combat racial or ethnic discrimination, nothing more.")

Since plaintiff has provided no admissible evidence from which it may be inferred that any of the defendants' conduct was racially motivated, or that any of the defendants infringed upon any of plaintiffs' rights enumerated in Section 1981(a), plaintiffs' Section 1981 claim is

dismissed in its entirety with prejudice.

### b.    Section 1983 Claim

Plaintiffs allege that "defendants deprived [Poux] of her First Amendment right to have access to and seek redress in the courts" and that "defendants engaged in a cover up in order to conceal the wrongful and unlawful conduct taken against [Poux]." (Third Amended Compl., ¶¶ 270-271). However, as noted above, there is no admissible evidence in the record from which a reasonable juror may find that any of the Nassau County defendants or Suffolk County defendants engaged in a cover up, i.e., a conspiracy, or in any act or omission which deprived Poux of access to the courts. Accordingly, plaintiffs' eighth cause of action in the third amended complaint is dismissed in its entirety with prejudice.

### 5.    <u>Monell</u> Claims

Plaintiffs concede that a municipality or municipal entity cannot be held liable under Section 1983 on a *respondeat superior* theory. <u>See</u> <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); <u>see</u> also <u>Connick v. Thompson</u>, 131 S.Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (5-4 decision) (holding that under Section 1983, governmental bodies are not vicariously liable for their employees' actions); <u>Los Angeles County, California v. Humphries</u>, 131 S.Ct. 447, 452, 178 L.Ed.2d 460 (2010) ("[A] municipality cannot be held liable solely for the acts of others, <u>e.g.</u>, *solely* because it employs a tortfeasor." (emphasis in original) (quotations and citation omitted)). To prevail on a Section 1983 claim against a municipal entity, a plaintiff must show: "(1) actions taken under color of

law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008).

Since plaintiffs have not established, *inter alia*, any deprivation of a constitutional right, their Section 1983 Monell claims (thirteenth and fourteenth causes of action in third amended complaint) are dismissed in their entirety with prejudice as a matter of law. See, e.g. City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571 (1986) (holding that if the individual officer inflicted no constitutional injury on the plaintiff, "it is inconceivable that [the municipal entities] could be liable to [the plaintiff]."); Martinez, 340 Fed. Appx. at 702 ("Because the arresting officers * * * did not violate plaintiff's constitutional rights, there can be no municipal liability * * *."); Curley, 268 F.3d at 71 ("[A] municipality cannot be held liable for inadequate training or supervision when the officers involved * * * did not violate the plaintiff's constitutional rights).

6.  Failure to Intercede Claim (Seventh Cause of Action in Third Amended Complaint)

"Liability may be premised not only on action but on a refusal to act." United States v. City of Yonkers, 96 F.3d 600, 613 (2d Cir. 1996). "Thus, government officials may be held liable under Section 1983 for a failure to do what is required." Id. (internal quotations, alterations and citations omitted).

"A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers," Jean-Laurent v. Wilkerson, No. 09-1929-pr, 2012 WL 386386, at * 2 (2d Cir. Feb. 8, 2012) (summary order)

(quoting O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988)), so long as the officer has "a realistic opportunity to intervene to prevent the harm from occurring." Id. (internal quotations, alterations and citation omitted); see also Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).

Since all of the constitutional tort claims have been dismissed, plaintiffs cannot maintain their failure to intervene claim. See, e.g. Curley, 268 F.3d at 72 (finding that liability for failure to intervene is precluded where there was no infringement of the plaintiff's constitutional rights by the arresting officers); Bancroft v. City of Mount Vernon, 672 F. Supp. 2d 391, 406 (S.D.N.Y. 2009). In any event, there is no admissible evidence in the record from which it may reasonably be inferred, *inter alia*,: (1) that Schepis or White, the only two (2) law enforcement officers named as defendants, were either aware of, or had an opportunity to intercede, in any alleged violation of plaintiffs' constitutional rights by other law enforcement officers; or (2) that any of the Nassau County defendants or Suffolk County defendants were present when Finn and/or the other Citibank defendants allegedly lost, misplaced or otherwise suppressed the videotapes at issue. Accordingly, plaintiffs' Section 1983 failure to intercede claim (seventh cause of action in third amended complaint) is dismissed with prejudice as a matter of law.

### 7.    State Law Claims

#### a.    Negligence Claims

"As a matter of public policy a negligence claim arising out of an investigation or prosecution will not be recognized under New York law." Batson-Kirk v. City of New York, No. 07-CV-1950, 2009 WL 1505707, at * 12 (E.D.N.Y. May 28, 2009) (quotations and citation omitted); see also Baez v. JetBlue Airways Corp., No. 09-CV-596, 2009 WL 2447990, at * 5 n. 4

(E.D.N.Y. Aug. 3, 2009) (quotations and citation omitted). "A claim for negligent training in investigative procedures must also fail, as it is akin to a claim for negligent investigation or prosecution, which is not actionable in New York." Baez, 2009 WL 2447990, at * 5 n. 4 (internal quotations and citations omitted). Since plaintiffs' negligence and negligent training, retention, supervision and hiring claims are based entirely upon the investigation and prosecution of Poux, those claims (tenth and eleventh causes of action in third amended complaint) are dismissed in their entirety with prejudice.

b.      Intentional and Negligent Infliction of Emotional Distress Claims

Liability for negligent or intentional infliction of emotional distress may not be imposed unless "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)(internal quotations and citation omitted); see also Conboy v. AT&T Corp., 241 F.3d 242, 258-59 (2d Cir. 2001) (intentional infliction of emotional distress); Blake v. Race, 487 F. Supp. 2d 187, 219 (E.D.N.Y. 2007) (negligent infliction of emotional distress). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." Stuto, 164 F.3d at 827.

As a matter of law, plaintiffs' third amended complaint does not allege conduct that can reasonably be regarded as so extreme and outrageous as to permit recovery for either negligent or intentional infliction of emotional distress. Moreover, there is no admissible evidence in the record from which a reasonable juror may find that Poux suffered an emotional injury as a result

of a breach of duty owed directly to her that endangered her physical safety so as to permit

recovery for negligent infliction of emotional distress.  See, e.g. Blake, 487 F. Supp. 2d at 219.

Accordingly, plaintiffs' intentional and negligent infliction of emotional distress claims (twelfth

cause of action in third amended complaint) are dismissed in their entirety with prejudice.


### 8.    Remaining Claims

In light of the dismissal of all of plaintiffs' federal claims and Poux's state law claims,

plaintiffs cannot maintain Ralph's derivative loss of consortium claim (fifteenth cause of action

in third amended complaint) or their claims for attorney's fees pursuant to 42 U.S.C. § 1988

(sixteenth and seventeenth causes of action in third amended complaint) as a matter of law.  See,

e.g. 42 U.S.C. § 1988(b) (permitting the award of costs and attorney's fees only to a prevailing

party in a Section 1983 action); Liff v. Schildkrout, 49 N.Y.2d 622, 632-33, 427 N.Y.S.2d 746,

404 N.E.2d 1288 (1980) (holding that a spouse's cause of action for loss of consortium is a

derivative one and does not exist "independent of the injured spouse's right to maintain an action

for injuries sustained."); Sterbenz v. Attina, 205 F.Supp. 2d 65, 71 (E.D.N.Y. 2002) (dismissing

loss of consortium claims in light of the dismissal of all of the injured spouse's primary causes of

action).  Accordingly, those claims are dismissed in their entirety with prejudice.


### III.    Conclusion

For all of the foregoing reasons, plaintiffs' motion for sanctions pursuant to Rule 37 of

the Federal Rules of Civil Procedure is denied, defendants' respective motions for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure are granted and the third

amended complaint is dismissed in its entirety with prejudice.  The Clerk of the Court is directed

to enter judgment in favor of defendants and to close this case.


SO ORDERED.

s/ Sandra J. Feuerstein
_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: March 23, 2012
          Central Islip, N.Y.